FILED

2005 Aug-19  PM 02:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **VERA BONNER,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:04-cv-01073-JHH** |
| **CITY OF BIRMINGHAM; and,** | ) | |
| **CLARENCE HARRIS,** | | |
| | ) | |
| **DEFENDANTS.** | | |

## MEMORANDUM OF DECISION

The court has before it the July 5, 2005 motion (doc. #11) of defendant the
City of Birmingham ("the City") for summary judgment.  Pursuant to the court's
July 5, 2005 order (doc. #12), the motion was deemed submitted, without oral
argument, on August 9, 2005.

### I. Procedural History

Plaintiff Vera Bonner commenced this action on May 7, 2004 by filing a
complaint in the Circuit Court of Jefferson County against the City, Clarence
Harris, a former Birmingham Police Officer, and "defendants 1-5."[1]  The City

---

[1]  The court will not address plaintiff's claims against "defendants 1-5," because fictitious
party practice is not authorized by either the Federal Rules of Civil Procedure or any federal
statute.  See New v. Sports & Recreation, Inc., 114 F.3d 1092, 1094 n.1 (11th Cir. 1997).

removed the complaint to this court on May 24, 2004 based on federal subject matter jurisdiction. The complaint alleges violations of 42 U.S.C. § 1983 and negligence under state law. Plaintiff contends that defendant Officer Harris raped her twice in May 2003 while he was in uniform and on duty. She alleges that the City had a policy of being deliberately indifferent to a need for increased training and supervision of Officer Harris. Plaintiff also alleges that the City is liable under state law because of its negligent training, supervision and retention of Officer Harris.

The City and plaintiff have filed briefs and submitted evidence in support of their respective positions supporting or opposing the City's motion for summary judgment.[2] The City submitted evidence[3] in support of its own motion for summary judgment and filed a supporting brief on July 18, 2005 (doc. #14). On

---

[2] Defendant Officer Harris answered the complaint pro se but has not otherwise participated in the lawsuit. The City does not represent Officer Harris.

[3] The City submitted the following evidence: excerpts of the deposition of Sergeant Harry Greenberg; excerpts of the deposition of Sergeant Roberta Payne; excerpts of the deposition of Detective Cynthia Morrow; affidavit of Police Chief Annetta Nunn; affidavit of Birmingham City Clerk Paula Smith; Birmingham Police Department Offense Report #040343947; Rules and Regulations of the Birmingham Police Department, Procedure 109-6; list of 29 phone calls from Vera Bonner to Clarence Harris; Detective Jerry Williams and Cynthia Morrow's interview of Vera Bonner; Miranda warning form and transcript of Detective Morrow's interview of Clarence Harris; City of Birmingham's Sex Harassment Policy; Clarence Harris's receipt of sexual harassment policy; complaints of other females against Clarence Harris; and excerpts from the Rule and Regulations of the Personnel Board of Jefferson County.

2

August 1, 2005, plaintiff filed a brief (doc. #16) and evidence[4] (doc. #17) in

opposition to the City's motion for summary judgment.  On August 5, 2005, the

City filed a brief in response to plaintiff's opposition to its motion for summary

judgment (doc. #21).

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229

F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings which it believes demonstrate

the absence of a genuine issue of material fact.  See id. at 323.  After the moving

party has met its burden, Rule 56(e) requires the nonmoving party to go beyond

---

[4] The plaintiff submitted the following evidence: Birmingham Police offense report; statement of Officer Clarence Harris; Inter-office correspondence from Sergeant Greenberg to Chief Annetta Nunn; City of Birmingham's Response to Plaintiff's Second Interrogatories; Detective Morrow's notes of interview with Clarence Harris; witness statement from Fannie Roberta Dawkins; excerpts of deposition of Vera Bonner; excerpts of deposition of Fannie Dawkins; excerpts of deposition of Detective Morrow; excerpts of deposition of Sergeant Payne; excerpts of deposition of Sergeant Greenberg.

the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  After

4

the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. See Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the

movant, sufficient to withstand a directed verdict, or the non-moving party may

come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency.  However, when

responding, the non-movant cannot rest on mere allegations, but must set forth

evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing

Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[5]

#### A. Plaintiff's Allegations and the City's Investigation

On March 30, 2003 plaintiff called the Birmingham Police Department for

assistance over a dispute with her adult son.  (Greenberg Dep. at 58; Offense

Report at 3; Pl. Dep. at 13-16.)  Officer Harris was dispatched to handle the call.

(Pl. Dep. at 13-14.)  He arrived at plaintiff's house, handled the issue with her son,

and the visit ended without incident.  (Id. at 13-16.)  Plaintiff contends that a few

weeks later, sometime in May 2003, in the early evening, Officer Harris returned

to her home.  (Id. at 23, 26-27; Offense Report at 4.)  He rang the doorbell, and

plaintiff let him inside her house.  (Pl. Dep. at 23-24.)  Officer Harris asked if she

was experiencing any more problems, and the two talked about her neighbors and

---

[5] If the facts are in dispute, they are stated in a manner most favorable to the non-movant.
See Fitzpatrick, 2 F.3d at 1115.

the drug problems in her neighborhood.  (<u>Id.</u> at 24-25.)  Plaintiff alleges that Officer Harris then exposed himself, picked her up, threw her on a bed, and raped her.  (<u>Id.</u> at 25-26.)  She testified that Officer Harris told her that he should handcuff her and then told her to pretend like she was handcuffed.  (<u>Id.</u> at 26.)  She contends that Officer Harris was dressed in his uniform and wearing his gun belt during the rape.  (<u>Id.</u> at 25-26, 68-70.)  After the incident, Officer Harris left plaintiff's house without saying anything.  (<u>Id.</u> at 27.)

According to plaintiff, Officer Harris returned to her house a couple of weeks later.  (<u>Id.</u> at 31.)  Plaintiff testified that he rang the doorbell, and she opened the door.  (<u>Id.</u> at 32.)  When she saw it was Officer Harris, she tried to close the door, but he forced the door open and entered her house.  (<u>Id.</u>)  Plaintiff contends that Officer Harris "threw [her] on the floor" in the living room and raped her again while still in his uniform.  (<u>Id.</u> at 34-35, 70.)  Officer Harris did not say anything to plaintiff and left immediately after the alleged rape because someone was calling Officer Harris on his police radio.  (<u>Id.</u> at 35-36.)

Plaintiff did not report either incident to the police at the time.  (<u>Id.</u> at 66.)  She did not tell any of her family, including her daughter who is a police officer for the City.  (<u>Id.</u>)  She testified that she did not report the rapes because of her children and because she was afraid.  (<u>Id.</u> at 66-67.)  Plaintiff stated that she called

her close friend, Roberta Dawkins, immediately after both alleged rapes.  (Id. at

29-30, 36.)  Although plaintiff also went to the doctor a couple of days after the

first alleged rape because she could not sleep after the incident, she did not tell her

doctor about the alleged rape.  (Id. at 28.)

Approximately nine months after the alleged rapes, on March 19, 2004,

plaintiff filed a complaint with Sergeant Harry Greenberg of the City's Police

Internal Affairs Division.  (See Offense Report at 1.)   Plaintiff told Sergeant

Greenberg  that Officer Harris raped her sometime in May 2003.  (Id. at 1-2, 4.)

This complaint was the first time plaintiff notified anyone at the Birmingham

Police Department about the alleged rape.  (See Pl Dep. at 66-67; Greenberg Dep.

at 59-60.)  The offense report reflects that plaintiff reported only one rape (id. at

4), and it is unclear from the record and briefs whether plaintiff claims that she

reported this second rape to Sergeant Greenberg at the time she filed her offense

report.

Regardless of what plaintiff initially reported, it is undisputed that during

the course of the City's investigation, both alleged rapes were reported and

investigated.  (See Greenberg Dep. at 63.)  There were two investigations of the

incident, a departmental investigation and a criminal investigation.  (See Memo to

Nunn.)   Sergeant Greenberg investigated the accusations, and because plaintiff

8

wanted to pursue a criminal prosecution, and not an administrative investigation,

Detective Cynthia Morrow of the Birmingham Police Department investigated

plaintiff's accusations against Officer Harris for a potential criminal prosecution.

(Id.; Greenberg Dep. at 57, 63, 112.)  Both Sergeant Greenberg and Detective

Morrow independently interviewed and took statements from plaintiff and Officer

Harris.  (Offense Report; Greenberg Interview of Harris; Morrow Dep. at 9.)

Detective Morrow also interviewed plaintiff's friend, Dawkins.[6]  (Morrow Dep. at

9; see Dawkins statement.)

Sergeant Greenberg's and Detective Morrow's independent interviews of

Officer Harris revealed similar information.  Officer Harris stated that he had a

relationship with plaintiff, that they exchanged phone numbers, and that plaintiff

"would call him and tell him that she loved him and wanted him to come over."

(Morrow Interview of Harris at 1-2; Greenberg Interview of Harris at 13.)  Officer

Harris denied raping plaintiff, but instead, stated that he and plaintiff had

consensual sex five or six times after his initial visit to her house.  (Morrow Dep.

at 11-12; Morrow Interview of Harris at 1-2; Greenberg Interview of Harris at 2,

6-8.)  Officer Harris admitted that he was in uniform every time he went to

_____

[6] It is unclear from the record and briefs whether Sergeant Greenberg interviewed
Dawkins.

plaintiff's house, and that two of the times that they engaged in sexual activity, Officer Harris was at work, but he was off duty for thirty minutes because he called in a 10-7.  (Greenberg Dep. at 137-38; Greenberg Interview of Harris at 6-12.)  Although Officer Harris had plaintiff's phone number programmed into his cell phone, it was under the name Vivian, as opposed to Vera, and Officer Harris referred to plaintiff as Vivian throughout his interview with Detective Morrow. (Morrow Dep. at 13-14.)

Officer Harris gave a copy of his cell phone records to Detective Morrow. (Morrow Interview of Harris at 2.)  The records showed over fifty calls between Officer Harris and plaintiff between August 2003 and February 2004, with twenty-nine calls from plaintiff's number to Officer Harris's cell phone after the alleged rapes.  (Id.; see also Bellsouth Records.)  Morrow's notes from the interview state that "the calls were heavy from August 2003 until December 2003, but the calls slowed to 1-3 calls from January to February with each call being made by [plaintiff] to [Officer Harris]."  (Morrow Interview of Harris at 2.)

After Detective Morrow interviewed Officer Harris, she attempted to speak with plaintiff again.  (Morrow Dep. at 28.)  Detective Morrow testified that she "wanted to go back and talk to [plaintiff] to ask her about the phone records," but plaintiff refused to speak to Detective Morrow.  (Id. at 29.)  Although Detective

Morrow stated that plaintiff told her that plaintiff's lawyer advised her not to speak with Detective Morrow, plaintiff testified at her deposition that her attorney told her "that the statutory limits or something was over the time for me to – for him to get arrested.  So it wasn't any use for me going back."  (Id.; Pl. Dep. at 65.)

Sergeant Greenberg testified at his deposition that it was impossible for the City to determine whether the alleged rapes occurred while Officer Harris was on duty.  (Greenberg Dep. at 53.)  Sergeant Greenberg sent a summary of his investigation with his findings and conclusions to Police Chief Annetta Nunn on April 1, 2004.  (See Memo to Nunn.)   The memo concluded that the phone records appeared to support the existence of a relationship between Officer Harris and plaintiff and that "[t]here are no known independent witnesses at this time and Officer Harris denied the allegation of rape."  (Id. at 2.)  Sergeant Greenberg, therefore, recommended that the case be classified as "not sustained," which means that the investigation was inconclusive because "there [wa]s a lack of evidence or a lack of independent witnesses to allow [the investigators] to either confirm or deny the allegation."  (Greenberg Dep. at 107-08.)

At the conclusion of Detective Morrow's investigation, the District Attorney reviewed the case, and, according to Detective Morrow, "the DA denied the warrant . . . [a]nd we were not able to complete the investigation [because

plaintiff refused to cooperate] and we closed the case up." (Morrow Dep. at 50.)

Officer Harris resigned during the investigation of plaintiff's complaint.

(Greenberg Dep. at 108.)

### B.  Other Complaints Against Officer Harris

Plaintiff alleges that the City had received previous complaints of a sexual

nature regarding Officer Harris. Five other complaints had been filed against

Officer Harris by females before plaintiff filed her complaint.[7] Of these five

complaints, only one was of a sexual nature.[8] That complaint was filed on May

---

[7] Andrea Woods Yearby's complaint against Officer Harris is not included in this number. The court is aware that Yearby filed a complaint against Officer Harris on February 27, 2004, and alleged that Officer Harris exposed himself to her. (See Payne Dep. at 9-12); see also Yearby v. City of Birmingham, et al., 2:04-CV-1401-JHH. Although Yearby complained three weeks before plaintiff complained, the alleged rape of plaintiff by Officer Harris occurred in May 2003, almost nine months before the Yearby incident. Yearby's complaint, therefore, is irrelevant to the analysis here because any knowledge by the City of Yearby's complaint and any action taken by the City in response thereto, would not have had any effect on plaintiff's allegations against the City.

[8] The other four complaints are as follows: (1) Mary Bernard filed a complaint on May 21, 2001 and contended that Officer Harris searched her car and purse without her consent and threatened to arrest her for "selling bad jewelry" to him. (See Complaint Report No. 2001-104.) Officer Harris received a letter of censure for threatening to arrest Bernard over a personal manner in violation of the Birmingham Police Department Rules and Regulations. (12/18/02 Letter of Censure.); (2) Aisha Adams filed a complaint on July 26, 2001 by Aisha Adams and alleged that Officer Harris used profanity with her and threatened to take her to jail. (Greenberg Dep. at 68.) Officer Harris received a letter of censure for this violation. (Id.); (3) Kimberly Clayton filed a complaint on May 24, 2002, and alleged that Officer Harris pushed her and used profane language towards her. (See Internal Affairs Report.) The complaint was not sustained and no disciplinary action was taken against Officer Harris. (Id.); and (4) Natassia Daniels filed a complaint on September 11, 2002 and alleged that Officer Harris used mace, pushed her out of a chair, and kicked her in the back. (See Internal Affairs Report.) The complaint was not sustained. (Id.)

26, 2000 by Tarkisha Johnson.  (Johnson Complaint at 1.)  Johnson alleged that on

May 25, 2000, Officer Harris and another officer approached her boyfriend and

arrested him for attempting to illegally turn on the power to an apartment.  (Id. at

2.)  Officer Harris went into the apartment and found Johnson who was wearing

only a jacket and her underwear.  (Id.)  Johnson reported that Officer Harris

instructed her to open her jacket and expose her breasts.  (Id.)  Officer Harris then

told her to remove her underwear, bend over, and spread her buttocks.  (Id.)

Johnson stated that Officer Harris never touched Johnson, but that he made a

number of statements that scared her.  (Id.)  This incident was investigated, and

Officer Harris was suspended for twenty days for conducting an improper strip

search and for lying about the strip search when he was first questioned about the

incident.  (See Greenberg Dep. at 70-71; Notice of Determination Hearing at 3;

Decision Upon Determination Hearing.)

## IV. Applicable Substantive Law and Analysis

Plaintiff contends that Officer Harris, while acting under color of state law,

and the City, due to its unlawful or unconstitutional policies and practices,

violated her right to be free from sexual assault under the Equal Protection Clause,

and sued Officer Harris and the City pursuant to 42 U.S.C. § 1983.  Plaintiff also

brought several state law claims against the City.  The City's July 5, 2005 motion

for summary judgment, as it addresses the § 1983 claims and is supported by its evidentiary submission, in effect asserts that the City is not liable for Officer Harris's alleged actions because there is no dispute of a material fact and plaintiff (1) has not come forward with evidence and cannot come forward with evidence from which a jury could properly conclude that the City had a policy, practice or custom, which was the moving force behind a violation of plaintiff's constitutional or federal statutory rights, and (2) has not come forward with evidence and cannot come forward with evidence from which a jury could properly conclude that the City was deliberately indifferent in its training, discipline or supervision of Officer Harris.   The City also contends that plaintiff's state law claims are barred under Alabama law because she did not notify the City of her claim for damages within six months of the alleged incident.  The court will address plaintiff's claims separately.

*A.  Section 1983*

Although "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents" on a theory of respondeat superior, a municipality may be held liable under § 1983 if the plaintiff shows that a "policy or custom" of the municipality was "the moving force" behind the constitutional deprivation.  Monell v. Dep't of Social Servs. of New York, 436 U.S. 658, 690-94

14

(1978).  A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality.  Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1479-80 (11th Cir. 1991).  A custom is a practice that is so settled and permanent that it takes on the force of law.  Monell, 436 U.S. at 690-91. Obviously, the City does not have a policy commanding its officers to commit an intentional crime, such as rape.  Further, plaintiff has not come forward with evidence from which a jury could properly conclude such a custom or practice actually existed.  However, the requisite custom or practice, and hence municipal liability, also may be based on a claim of inadequate training "where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants [such that the failure to train or supervise] can be properly thought of as a city 'policy or custom' that is actionable under § 1983." City of Canton v. Harris, 489 U.S. 378, 389 (1989).  Plaintiff's § 1983 claims against the City are based solely upon an asserted failure to train and a failure to supervise. The court will address each claim in turn.

### 1.  Failure to Train

In evaluating a failure to train claim, "the focus must be on the adequacy of the training program in relation to the tasks the particular officers must preform."

Id. at 390-91. Merely because one particular officer received inadequate training is insufficient to establish municipal liability. Id. at 391. Likewise it is insufficient to show only "that an injury . . . could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury causing conduct." Id. Rather, deliberate indifference exists where a municipality continues to utilize a particular training program or practice which results in "a pattern of tortious conduct," of which municipal policymakers are or should be aware. Brown, 520 U.S. at 407-08. The plaintiff must, therefore, show "that in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390. In other words, the plaintiff must demonstrate that the City had notice that its procedures were inadequate and likely to result in a violation of constitutional rights. See id.

Plaintiff argues that the City's training policy was inadequate and bases this conclusion solely on Officer Harris's previous misconduct. Plaintiff offers no evidence as to what policy of training the City followed or how it was deficient. The City contends that it has an effective training program that either meets or

16

exceeds the applicable state and federal recommendations.[9]  (See Affidavit of

Police Chief Annetta Nunn.)  Additionally, the evidence presented by both

plaintiff and the City clearly establishes that the City has a policy of investigating

complaints, keeping a record of all complaints, and punishing officers against

whom a complaint is confirmed.

Plaintiff's allegation that Officer Harris's past action alone made the need

for training obvious cannot sustain her claim. "That a particular officer may be

unsatisfactorily trained will not alone suffice to fasten liability on the city, for the

officer's shortcomings may have resulted from factors other than a faulty training

program." City of Canton, 489 U.S. at 390-91.  Thus, "[i]n resolving the issue of a

city's liability, the focus must be on the adequacy of the training program . . . ."

Id. at 390 (emphasis added).  A "program" as used in City of Canton is

"necessarily intended to apply over time to multiple employees." Bd. of County

County Comm'rs of Bryan County, Ok. v. Brown, 520 U.S. 397, 407 (1997).

Because Plaintiff failed to identify a program followed by the City or a

---

[9] The court acknowledges that the affidavit of Police Chief Annetta Nunn merely explains that the City has a sufficient training policy in general terms, and does not go into significant detail.  Although such an allegation would not be sufficient if the City bore the burden of proof at trial, because plaintiff bears the burden of proving her case, the City's affidavit is sufficient to discharge its burden at the summary judgment stage. See Fitzpatrick, 2 F.3d at 1115-16. Plaintiff, therefore, must come forth with evidence from which a reasonable jury could find in her favor.

deficiency in its program, her claims fail.  In fact, Supreme Court precedent

suggests that it would be virtually impossible for a jury to resolve the issue of

causation and conclude that the City's policy represented a conscious decision that

was deliberately indifferent to the rights of its inhabitants, where the plaintiff has

not clearly identified a policy and its flaw.  See id. (the "[e]xistence of a 'program'

makes proof of fault and causation at least possible in an inadequate training

case.").  Therefore, plaintiff's objection that the City's adequate training program

for some reason did not "take" with Officer Harris provides an insufficient basis

on which to ground the City's liability for failure to train.

      Plaintiff seems to argue, however, that a known history of constitutional

violations establishes the existence of a custom or policy of deliberate indifference

on part of the City.  Although not a holding of the Supreme Court, in a footnote in

City of Canton, the Supreme Court stated that "[i]t could also be that the police, in

exercising their discretion, so often violate constitutional rights that the need for

further training must have been plainly obvious to city policymakers. " City of

Canton, 489 U.S. at 390 n.10.  Accordingly, the Eleventh Circuit has recognized

that the relevant history must be composed of actual violations that have occurred

with a sufficient frequency.  See, e.g., Young v. City of Augusta, 59 F.3d 1160,

1172 (11th Cir. 1995) ("The need for more or better training may be obvious

18

where a pattern of constitutional violations exists such that the municipality knows or should know that corrective measures are needed.") ; <u>Wright v. Sheppard</u>, 919 F.2d 665, 674 (11th Cir. 1990).  Assuming that such a history may be used to establish that a training program that otherwise appears adequate is in fact inadequate, plaintiff has failed to create a genuine issue of material fact as to any such history.

Plaintiff has failed to produce evidence that shows "a history of widespread prior abuses." <u>Id.</u>  The only evidence submitted to the court with any relevance to the incident alleged in this case is the complaint against Officer Harris by Tarkisha Johnson on May 26, 2000.  Although the court agrees with plaintiff that the conduct embraced in this complaint is of a sexual nature and finds such conduct troublesome, one prior incident does not come close to establishing a pattern of previous abuses.  Moreover, it is undisputed that the complaint was properly investigated and that Officer Harris was punished for this incident.  Plaintiff has not produced any other evidence establishing a history of widespread abuse.  As such, plaintiff cannot sustain a claim for failure to train and did not establish deliberate indifference on the part the City with regard to training.

### 2.  Failure to Supervise

The Eleventh Circuit applies the same legal standards to claims for failure

to supervise as it does to claims for failure to train.  See e.g., Sewell v. Town of Lake Hamilton, 117 F.3d 488 (11th Cir. 1997); Vineyard v. County of Murray, Ga, 990 F.2d 1207, 1212 (11th Cir. 1993).  As such, plaintiff's claim for failure to supervise fails for the same reasons as does her failure to train claim.  Plaintiff offers no evidence of the City's actual policy of supervising its officers, no evidence of any particular deficiency within that program, and no evidence that the City's policy was the actual cause of Officer Harris's actions.  See City of Canton, 489 U.S. at 391.  Rather, plaintiff merely contends that Officer Harris's previous conduct made it obvious that he required more supervision.  As discussed above, this contention is insufficient as a matter of law.  Therefore, plaintiff cannot establish deliberate indifference on the part the City with regard to supervision and cannot prevail on her claim for failure to supervise.  See id. at 390.[10]

---

[10]  Moreover, plaintiff's claims of failure to train and failure to supervise also likely fail because Officer Harris's actions were so obviously incorrect, that they do not readily give rise to an inference of deliberate indifference on the part of a municipality.  In Sewell v. Town of Lake Hamilton, a police officer conducted an unnecessary strip search of the plaintiff and molested the plaintiff. 117 F.3d at 489.  The district court refused to grant summary judgment for the defendant municipality on the plaintiff's claims of failure to train and supervise. Id.  On appeal the Eleventh Circuit reversed, and reasoned that "[w]here the proper response . . . is obvious to all without training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise." Id. at 490.  (quoting Walker v. City of New York, 974 F.2d 293, 299-300 (2d Cir. 1992)).

*B. State Law Claims*

Section 11-47-23 of the Alabama Code states that all claims for damages arising out of torts must be presented within six months from the alleged tort. Ala. Code § 11-47-23. Section 11-47-192 of the Alabama Code requires an injured party to file a sworn statement with the clerk "stating substantially the manner in which the injury was received, the day and time and the place where the accident occurred and the damages claimed." Id. § 11-47-192. These statues are construed together. Etherton v. City of Homewood, 741 So. 2d 1078, 1080 (Ala. 1999). If an injured party does not file a sworn claim or a lawsuit within the six month period, "no recovery shall be had against any city or town on a claim for personal injury." Ala. Code § 11-47-192; see Diment v. City of Mobile, 474 So. 2d 663, 666 (Ala. 1985).

Plaintiff's alleged injury occurred sometime in May 2003. The City submitted evidence that plaintiff did not file any claim with the City clerk until the City received notice of the instant lawsuit on May 21, 2004, a year after the alleged incidents occurred. (See Aff. of Paula Smith at 2.) Moreover, Plaintiff did not report the alleged rape to the police department until March 19, 2004, approximately nine months after the alleged incident. Plaintiff does not dispute these facts. The City, therefore, is entitled to summary judgment as to plaintiff's

21

state law claims.

## V.  Conclusion

The court finds that no material issues of fact remain and that the City of Birmingham is entitled to judgment as a matter of law as to all claims asserted against it by plaintiff.   A separate order will be entered in accordance with this memorandum.  The court expressly determines that there is no just reason for delaying entry of final judgment as the claims to be resolved by such order. Therefore, the court will direct such order to be entered as a final judgment under Federal Rule of Civil Procedure 54(b).

**DONE** this the ___19th___ day of August, 2005.


_____
SENIOR UNITED STATES DISTRICT JUDGE

22